IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ELAINA S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ELAINA S., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
CHAD S., APPELLANT.

Filed November 21, 2023.    No. A-23-313.

Appeal from the County Court for Seward County: C. JO PETERSEN, Judge. Affirmed.

Sanford J. Pollack, of Pollack & Ball, L.L.C., for appellant.

Lory A. Pasold, Chief Deputy Seward County Attorney, for appellee, State of Nebraska.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

ARTERBURN, Judge.

## INTRODUCTION

Chad S. appeals from an order of the county court, sitting as a juvenile court, which order terminated his parental rights to his minor child, Elaina S. The court found that termination of Chad's parental rights was proper under Neb. Rev. Stat. § 43-292(2), (6), (7), and (9) (Reissue 2016) and was in Elaina's best interests. Upon our de novo review of the record, we affirm.

## BACKGROUND

Chad and Amy S. are the biological parents of Elaina, born in June 2017. Chad and Amy are engaged to be married and have been in a romantic relationship for approximately 13 years. They lived together prior to Elaina's removal from their home and, according to Chad, continued to live together at the time of the termination hearing. While the juvenile court proceedings involved both Chad's and Amy's parental rights to Elaina, Amy relinquished her parental rights in March 2023. As a result, this appeal concerns only Chad's parental rights to Elaina. Amy's

- 1 -

involvement in the juvenile court proceedings will be discussed to the extent necessary to provide context.

The family's involvement with the Department of Health and Human Services (the Department) began in April 2021 when police were called to the trailer home Chad, Amy, and Elaina were residing in as a result of Chad assaulting Amy. When law enforcement arrived, they discovered that then 3-year-old Elaina had been present during the assault. They also discovered drug paraphernalia "that was accessible" to Elaina. Chad admitted to smoking marijuana in the small trailer home when Elaina was present. Chad was arrested and ultimately convicted of attempted third degree domestic assault and disturbing the peace. He remained in jail until July 27.

The Department offered voluntary services to Amy and Elaina after Chad's arrest. As a part of those services, a Department case worker visited the family home on a monthly basis. During the case worker's routine visit on August 30, 2021, Elaina disclosed that Chad had displayed his private parts to her. By this time, Chad had been released from jail and was again residing with Amy and Elaina. Due to Elaina's disclosures, the case worker informed Amy that Chad needed to leave the residence until a forensic interview of Elaina could be completed. Amy declined to require Chad to leave, instead agreeing that Elaina should be removed.

During a subsequent forensic interview with Elaina, she disclosed that Chad has bitten her on her back and on her arm and has punched her in the face, causing a bloody nose. A physical examination of Elaina revealed a bite mark on her back and bruising on her left shoulder. Elaina further disclosed that Chad has put his penis inside of her and has asked her to tickle and suck on his penis. An ex parte order for emergency temporary custody was entered August 31, 2021, removing Elaina from Chad's and Amy's home and placing her in the Department's custody in a foster home.

Also on August 31, 2021, the State filed a petition in the Seward County Court alleging that Elaina was a juvenile within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) as to both Amy and Chad. The allegations concerning Chad included that Elaina lacked proper parental care and was in a situation dangerous to life or limb as a result of Chad assaulting Amy in Elaina's presence in April 2021 and smoking marijuana in the home while Elaina was present and as a result of Elaina's disclosures of Chad's physical and sexual abuse.

At an initial hearing held on September 9, 2021, Chad denied the allegations in the State's petition. The court ordered that the Department's custody of Elaina should continue pending a contested adjudication hearing. The court also ordered that no visitation between Chad and Elaina was to occur pending further order of the court. Amy was permitted to have supervised visitation with Elaina.

A contested adjudication hearing was held on December 3, 2021. At the close of the hearing, the county court adjudicated Elaina as a child within the meaning of § 43-247(3)(a) as to Chad. The court "sustained" the allegations in the petition. The court also continued its previous order denying visitation between Chad and Elaina "pending further hearing and receipt of therapist reports regarding the same."

After Elaina was adjudicated, multiple dispositional orders were entered by the county court which essentially adopted the reunification plans recommended by the Department. The tenets of such reunification plans included Chad participating in an initial diagnostic interview, a substance abuse evaluation, and a parenting assessment and following the recommendations of

those evaluations; cooperating with family support services; attending a domestic violence batterer's course; submitting to drug testing one time per week; and obtaining safe and stable housing. Notably, Chad was never permitted to have any sort of visitation with Elaina during the lower court proceedings.

On January 17, 2023, the State filed a motion to terminate Chad's parental rights to Elaina. In the motion, the State alleged that Chad had substantially and continuously or repeatedly neglected and refused to give Elaina necessary parental care and protection pursuant to § 43-292(2); that reasonable efforts to reunify the family since the § 43-247(3)(a) determination failed to correct the conditions leading to that determination pursuant to § 43-292(6); that Elaina had been in an out-of-home placement for 15 or more months of the most recent 22 months pursuant to § 43-292(7); and that Chad had subjected Elaina to aggravated circumstances, including chronic abuse or sexual abuse pursuant to § 43-292(9). The motion also alleged that termination of Chad's parental rights was in Elaina's best interests. Chad denied the allegations in the motion to terminate his parental rights. A contested hearing was scheduled for March 27, 2023.

At the termination hearing, the State called four witnesses to testify: Rachel Foley, the Department case worker assigned to the family from December 2021 through January 2023; Sierra Watson, the Department case worker who took over the case in January 2023; Billy Wassom, the initial family support provider for Chad, and Elaina's foster parent since June 2022; and Chad. After the State rested, Chad called Shiloh Lively, his current family support provider to testify. We recount the witness testimony in some detail here.

Foley testified regarding her management of the family's case between December 2021 and January 2023. Essentially, Foley explained that during this period, Chad did little to progress toward reunification with Elaina. And that rather than complying with the county court's reunification plan, Chad chose to struggle against those that were trying to help him.

In December 2021 when Foley began case management for the family, family support was the primary service being provided to Chad. At that time, the family support worker was supposed to be working with Chad on parenting skills, age-appropriate discipline, and knowledge of normal childhood development. However, Chad's participation with family support was limited and he was not receptive to gaining new skills or knowledge. Chad believed he did not need help and was adamant that he had done nothing wrong to warrant Elaina's removal from his home. Foley testified that Chad was often verbally aggressive with her during their interactions.

Similarly, Wassom, who was the family support worker in December 2021, testified that while he attempted to assist Chad with parenting skills and with obtaining employment, Chad's aggressive, erratic, and agitated behaviors prevented Chad from making any progress or even having productive family support sessions. In fact, Wassom testified that Chad's behaviors were affecting Amy's ability to gain anything from family support, so Chad was ultimately assigned a new family support provider. Unfortunately, Chad only attended one session with this new provider before threatening to harm the provider with extreme physical violence. As a result, family support services were terminated for at least 6 months.

In December 2021, Chad was not permitted to have any sort of visitation with Elaina as a result of the allegations of physical and sexual abuse. Additionally, even though Amy's visits with Elaina were to occur in the family's home, Chad was not allowed to be present. Chad did not always abide by this rule, often sitting in his car right outside the family's home when Elaina was

there or driving by a park where Amy and Elaina visited. Elaina often exhibited signs of stress and anxiety while visiting Amy in the family's home. Ultimately, visits between Amy and Elaina were moved from the family's home as a result of Chad's continued presence and as a result of inappropriate articles displayed within the home. Such inappropriate articles included "sex toys" which were easily accessible to Elaina and magazine images of women in very little clothing hung on the home's walls. When Wassom, who was supervising visits between Amy and Elaina, confronted Chad about the inappropriate items, Chad became aggressive and argued that the items were not inappropriate for Elaina and that it was his home, and he could do what he wanted. Wassom testified that the magazine images, in particular, affected Elaina's behaviors during visits. Elaina would not listen, would act hyperactive, and would display sexualized behavior.

Foley testified that between January and June 2022, Chad attended monthly team meetings, but was often aggressive and inappropriate, such that the meetings were not productive for anyone. At one team meeting held during that time period, Chad began speaking to "spirits" he perceived to be present. Chad and Amy were ultimately offered separate team meetings so that Amy's meetings could be more productive and forward-thinking, but Chad just disrupted Amy's individual meetings.

During one team meeting with Chad, he was asked about his willingness to stop smoking marijuana. Chad was simply unwilling to stop this behavior, even for Elaina's benefit. At other team meetings, the sexual abuse allegations were addressed with Chad. Chad continually denied hurting Elaina, explaining that her age-inappropriate sexualized behavior was actually normal.

Foley testified that early on in the proceedings, Chad did submit to both a substance abuse evaluation and a mental health evaluation. From these evaluations, it was recommended that Chad participate in intensive outpatient treatment for his substance abuse. Chad did not follow this recommendation. Foley identified a treatment program for Chad to attend, but Chad did not follow through despite being given three separate opportunities by the treatment program. Chad initially failed to consistently attend the program and was, thus, unsuccessfully discharged. Foley had offered to provide Chad with transportation to treatment, but Chad insisted that Amy had to drive him. Chad was readmitted to the treatment program on two separate occasions but was terminated from treatment both times due to his aggressive and inappropriate behaviors during sessions. By May 2022, Chad expressed his firmly held belief that he did not need substance abuse treatment or mental health treatment.

In March 2022, Chad gained employment at a fast-food restaurant. However, he was terminated from this employment after only 2 days because he failed to show up to work. In May 2022, Chad lied to Foley about obtaining new employment. Chad remained unemployed through at least August 2022, and after that time, was only employed sporadically.

In May 2022, Chad threatened Foley and other Department workers with physical harm after the possibility of terminating his parental rights was broached.

In August 2022, the county court ordered Chad to participate in a second mental health evaluation and substance abuse evaluation. The court also implemented weekly drug testing. Initially Chad was not consistent with attending drug testing, missing 4 weeks in a row. Chad was then provided with a sweat patch to wear constantly to monitor his drug use. Chad consistently tested positive for THC on every drug test due to his ongoing marijuana use. In addition, toward the latter part of 2022, Chad tested positive for methamphetamine on three or four occasions.

Chad's follow-up mental health and substance abuse evaluations resulted in another recommendation that Chad attend intensive outpatient treatment and in a recommendation that he participate in individual therapy. The full recommendation reads as follows:

> It is recommended that Chad attend weekly individual sessions with a dually competent therapist to address his precontemplative nature, his criminal thinking patterns, his anxiety, and his substance use. It is recommended that he obtain a parenting assessment to determine his parenting skills and to address his cognitive functioning, as he failed some of his mental status exam questions and has a history of being in special education. It is recommended he remain abstinent from all substances and to drug test frequently. It is recommended that he complete his domestic violence class. It is also recommended that he attend a medication management appointment to determine medication needs, per his request. Should he continue to use substance and test positive, it would be appropriate for him to be evaluated for a higher level of care.

Chad failed to readily complete any of these recommendations. In particular, he failed to participate in intensive outpatient treatment. He did attend two individual therapy sessions but was unsuccessfully discharged by his therapist due to his poor attitude. The therapist explained in a letter to Foley:

> It is my clinical opinion that [Chad] is not likely going to benefit from treatment or therapy at this time. I am not suggesting he doesn't *need* treatment and/or therapy because I do believe there are significant issues in which he could work on in order to lead a healthier more productive life both for himself and his family. What I am suggesting is that due to his level of motivation, lack of insight, high antisocial attitudes and beliefs along with his likely present personality disorder I am picking up on it simply doesn't make sense to attempt to engage him at this time. It is not helpful or productive to him. Our sessions are not productive and likely won't be. He blames "the system" for his involvement with [the Department] and appears to lack any insight or accountability nor can he articulate anything in life he needs to work on or improve, even when it doesn't relate to the current case whatsoever.

(Emphasis in original.)

Foley testified at the March 2023 termination hearing that it was also recommended as part of Chad's rehabilitation plan that he participate in a domestic violence batterer's intervention program. Chad was given two opportunities by the provider to complete the 30-week program. Upon his first opportunity in October 2022, Chad only attended two sessions before he was terminated from the program due to his extremely disruptive behavior. The provider explained to Foley in a letter:

> This letter is to inform you that Chad . . . has been terminated from the Orr Domestic Abuse Intervention Program. He has been discharged due to being disrespectful. According to our program guidelines, by being disrespectful to the facilitator or other students in the class, the contract he signed at his intake has been broken. [Chad] showed disrespect towards the facilitator on several occasions along with me[n]tal issues that need to be addressed before attending this program. He completed 2 of 30 classes.

Foley testified that Chad was given a second opportunity to attend a domestic violence program, but he failed to attend any sessions.

Foley testified that Chad did attend one meeting for Elaina at her school during her tenure on the case. He also consistently kept in contact with Foley, sometimes as often as three times per week. However, whenever their conversations addressed Chad's need to make changes or comply with the reunification plan, he became verbally aggressive with Foley. Foley indicated that Chad continually denied that Elaina had been sexually assaulted. He also continually expressed a desire to have Elaina returned to his care and custody.

In June 2022, Elaina was placed in the home of Wassom and his family after her original foster placement asked that she be moved due to her aggressive and uncontrollable behaviors. As explained above, Wassom was originally the visitation supervisor for Amy's and Elaina's supervised visits and the family support provider. Due to his involvement in the case and seeing Elaina at least four times per week, Wassom testified that he had bonded with Elaina. In addition, he was well aware of Elaina's behavioral problems, including her display of age-inappropriate sexualized behavior and inability to understand personal boundaries. Wassom actually started attending parent-child interactive therapy with Elaina prior to her placement with him, because Amy did not have time to participate in the therapy and Chad was prohibited from attending due to the court's no contact order. After Elaina and Wassom successfully completed such therapy, Elaina began attending individual therapy two times per week. On one of those days, the therapist visits Elaina at her school to address her behavior in that environment.

Wassom testified that Elaina has "come a long way and learned so much" since being placed in his home in June 2022. Wassom testified that Elaina's ability to communicate and express herself appropriately has improved. Elaina started kindergarten in the fall of 2022 and while she had a difficult start, Wassom has worked with her school to implement some techniques and activities that have helped Elaina improve her behaviors at school. Elaina does have an individualized education plan, for which there are regular meetings. At the most recent meeting in February 2023, neither Chad nor Amy attended despite being notified of its occurrence.

While Wassom has observed some improvements with Elaina's sexualized behavior, she does still struggle with this issue. Additionally, Elaina has continued to report to Wassom instances of sexual abuse by Chad, including Chad sexually penetrating her and Chad watching pornography with her. In the month or so prior to the termination hearing, Elaina has reported to Wassom that she is having nightmares where Chad is sexually assaulting her; physically harming her; and taking her from Wassom's home. Elaina is taking medication to help her sleep through the night.

Foley reported that Elaina appears to be very comfortable at Wassom's home. Elaina has expressed concerns about returning to Chad's and Amy's home, explaining that they are not safe people.

In January 2023, Watson took over as the Department case worker for the family. She continued to act as the case worker through the March termination hearing. During her transition meeting with Chad in January, Chad informed her that he was not planning on doing anything required of him by the reunification plan. He continued to indicate that he did not understand why Elaina could not just return to he and Amy's home. At that time, Chad and Amy were living in a small camper together on Amy's mother's land. Family support services had resumed for Chad.

Chad did complete some parenting classes through family support. Due to Chad's recent drug tests being positive for methamphetamine and marijuana, Chad was required to participate in a third substance abuse evaluation. After the evaluation it was recommended that he participate in inpatient treatment. Chad initially expressed an unwillingness to attend. However, in late January, he told Watson he would attend treatment if he "had to."

On January 24 and 25, 2023, Chad was jailed as a result of possessing methamphetamine. In February 2023, Chad was again arrested for possessing methamphetamine. This time, he remained in jail until March 20, a week prior to the termination hearing. Upon his release from jail, Chad admitted to having a substance abuse problem and expressed a willingness to attend treatment. He informed Watson that he was going to start making telephone calls to treatment facilities.

Watson testified that Chad has a strong desire to achieve reunification with Elaina. However, because Watson did not believe that Chad utilized the services available to him during the 18 months that Elaina had been in an out-of-home placement and the juvenile case had been pending, she testified that Chad had not corrected any of the reasons related to Elaina's removal. Watson indicated through her testimony that termination of Chad's parental rights was in Elaina's best interests.

The State called Chad to testify. During his testimony, Chad reiterated that he is now ready to admit that he has a substance abuse problem and is ready to obtain treatment. Chad acknowledged that he needs to obtain sobriety in order to be an effective parent. However, he denied that he had done anything else, including sexually assaulting Elaina, which would have warranted Elaina's removal from his home: "I've done nothing." Chad told the county court that he is a "very good father," that he loves Elaina, and that he desires to have her returned to his care.

Chad currently lives in an apartment with Amy after having been released from jail on March 20, 2023. He indicated that despite Amy relinquishing her parental rights to Elaina, they still plan on getting married and continuing their relationship, even if he is permitted to reunify with Elaina. Chad testified that he is currently unemployed due to his recent incarceration and his need to obtain substance abuse treatment.

Chad attempted to explain Elaina's sexualized behaviors by claiming that she had a fascination with her private parts even when she was in diapers. He testified that Elaina would touch her private parts when he changed her diapers. In fact, at that time, he was worried that one day he would be accused of sexually abusing her. Chad also testified that at a very young age, Elaina began asking questions about the differences between boys' and girls' anatomies. During his testimony, Chad recounted answering Elaina's questions using vulgar and age-inappropriate language. Chad did admit that when Elaina was approximately 1½ years old, she walked in on him when he was naked, masturbating, and watching pornography. Elaina also walked in on Chad and Amy having sexual intercourse on multiple occasions. Chad admitted to watching movies that were inappropriate when Elaina was present.

Chad agreed that he was "disruptive" and argumentative with the Department case workers. However, he justified his behavior by explaining that he was very frustrated about being falsely accused of sexually abusing Elaina. Chad pointed to his participation in multiple substance abuse and mental health evaluations as evidence of his efforts toward reunification. However, Chad also admitted that he was not truthful about his ongoing methamphetamine use during his substance

abuse evaluations. He also admitted that, up to the time of the termination hearing, he had not completed either outpatient or inpatient substance abuse treatment. Chad blamed being terminated from one outpatient treatment program on the teacher overreacting to his behaviors. Similarly, he claimed that he did not complete a domestic violence program due to the actions of the program's instructor. Chad stopped attending individual therapy because he believed his therapist told him that he did not need therapy anymore. Chad testified that during recent family support sessions, he did complete some parenting classes and worked on an anger management course. He denied any actual issues with anger and asserted that people often just overreacted to his behavior.

Chad testified that he did attend a meeting regarding Elaina's individualized education plan in January 2022. According to Chad, this meeting was not very productive, because Elaina's teacher was not very forthcoming with him about Elaina's behavioral issues and current situation in school. Chad was frustrated and told the teacher that he "taught [Elaina] how not to take shit from anyone because [he] never would." Even at trial, Chad was unable to articulate Elaina's behavioral issues or current needs, explaining that no one has kept him apprised of how Elaina has been doing since her removal. Chad admitted that he did not attend the February 2023 meeting regarding Elaina's individualized education plan because he was incarcerated. Chad did acknowledge that he was informed of the meeting and informed of how to participate.

When questioned about the inappropriate magazine pictures displayed in his apartment early on in the proceedings, Chad continued to disagree that he needed to take them down and denied that they were inappropriate or harmful to 4-year-old Elaina. Chad claimed that because the women in the pictures were wearing underwear, that the photos were not actually pornographic. He told the court the photos were displayed as part of a "collage of family photos and just a mixture of other photos and stuff, friends and family and just it was like a collage. . . ." Chad also indicated that he did not care about the women's bodies pictured, only the "cool tattoos" on their bodies. From the witness stand, Chad offered the actual pictures for the court to view. Chad testified that, ultimately, he took the magazine pictures down from the wall so that Amy could continue to have visits with Elaina.

After the State rested, Chad called Lively, his current family support provider, to testify. Lively had been working with Chad since August 2022. The goals initially established for the family support sessions included, completing parenting classes and education; completing a domestic violence course; learning about sexual abuse; and participating in routine drug testing. Lively indicated that at first, Chad was cooperative, and the sessions went smoothly. She met him weekly for one hour at a time. During these initial sessions, Chad participated in two child sexual abuse prevention training programs with her. He also worked through an anger management workbook.

However, by November or December, Lively observed a change in Chad's demeanor. He acted more agitated, struggled to focus on the tasks at hand, and made her feel unsafe with his aggressive actions. Lively described one occasion where Chad yelled loudly at her while they were meeting at a restaurant.

Lively explained that while Chad has expressed a desire to achieve reunification with Elaina, that his progress in the 7 or 8 months prior to the termination hearing included a lot of "ups and downs." Lively did testify that during the last week prior to the hearing after Chad was released from jail, that he had started working with her on setting up inpatient treatment. She explained that

they had learned that Chad would need to obtain a new substance abuse evaluation before being admitted to any program.

On April 14, 2023, the county court issued a lengthy written order terminating Chad's parental rights to Elaina. The court found that termination was warranted pursuant to § 43-292(2), (6), (7), and (9), explaining, the evidence presented at the termination hearing revealed that Chad:

> had never made sufficient progress to have [Elaina] returned to his home/to his care. In fact, just the opposite is true, the testimony was that [Chad] had done little to address the matter which brought his daughter before this Court. [Chad]'s testimony that he is "now ready" to do some of the necessary requirements to work toward reunification is simply too little, too late.

The court went on to state:

> From the removal on August 30, 2021, numerous services were provided to [Chad] in an effort to comply with the court ordered [reunification plan] and reunify Elaina with [Chad]; those services were unsuccessful. The testimony presented was that [Chad] has numerous issues, including domestic violence, mental health and substance abuse issues that he simply refused to address even with the numerous and varied services that were offered by [the Department]. The effort made by [Chad] to address any issue was minimal at best.

In the order, the county court also found that termination of Chad's parental rights was in Elaina's best interests.

> [T]he Court finds, based on all of the evidence received, it is clearly in the best interest of Elaina . . . to have [Chad's] parental rights terminated. Elaina not only needs, she is entitled to have, permanency, stability, ongoing care and therapy, safety and love. The testimony was very clear that [Chad] was simply non-compliant and non-cooperative with [the Department], meeting none of the requirements of the [court-ordered rehabilitation plan] and simply cannot parent Elaina. The evidence was also clear that [Elaina] has not been returned to [Chad]'s custody throughout the proceedings and as of the date of trial herein. The Court finds that such a showing has been made by the State that Chad [] is unfit to parent Elaina [] under said best interest analysis.

Chad appeals from the county court's order terminating his parental rights.

## ASSIGNMENTS OF ERROR

Chad first assigns as error the county court's determination that statutory grounds existed to warrant the termination of his parental rights. Specifically, he argues that there was insufficient evidence presented to prove that termination was warranted pursuant to § 43-292(2), (6), and (9). Chad also assigns that the county court erred in finding that the State presented clear and convincing evidence to demonstrate that Elaina's best interests required termination of his parental rights.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012).

ANALYSIS

Section 43-292 lists the grounds for terminating parental rights. *In re Interest of Mateo L. et al., supra*. It is the State's burden to show by clear and convincing evidence that one of the statutory bases enumerated in § 43-292 exists and that termination is in the children's best interests. *In re Interest of Mateo L. et al., supra*.

*Statutory Grounds for Termination.*

The county court found by clear and convincing evidence that grounds existed for termination of Chad's parental rights pursuant to § 43-292(2), (6), (7) and (9). On appeal, Chad does not contest that there was sufficient evidence to demonstrate the application of § 42-292(7). And, upon our de novo review, we agree that there was sufficient evidence presented to demonstrate that termination of his parental rights was warranted under § 43-292(7). Because any one of the bases for termination codified in § 43-292 can serve as the basis for termination when coupled with evidence that termination is in the best interests of the child, we do not decide whether the other statutory subsections also warrant termination of Chad's parental rights. See *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

Section 43-292(7) provides for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." That period of time was set by the Legislature as a guideline for what would be a reasonable time for parents to rehabilitate themselves to a minimum degree of fitness. *In re Interest of Mateo L. et al., supra*. This section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of the parent. *Id*. In other words, if the 15-out-of-22 formula is met, § 43-292(7) is met. *In re Interest of Mateo L. et al., supra*.

Elaina was removed from her parents' home and placed in the Department's custody on August 31, 2021, and has been in an out-of-home placement continuously since that time. The motion to terminate Chad's parental rights was filed on January 17, 2023, at which time Elaina had been in an out-of-home placement for almost 17 months. By the time of the termination hearing on March 27, Elaina had been in an out-of-home placement for almost 19 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Chad's parental rights under § 43-292(7) were proven by sufficient evidence.

*Best Interests of Children.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J., supra*. There is a rebuttable presumption that the best interests of a child are

served by having a relationship with his or her parent, which is overcome when the State has proven that the parent is unfit. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). Parental unfitness has been defined as "a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being." *Id*. at 370, 945 N.W.2d at 151.

In situations where termination of parental rights is based on § 43-292(7), the Nebraska Supreme Court has held that appellate courts must be particularly diligent in their de novo review of whether termination of parental rights is in fact in the child's best interests. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). Because § 43-292(7) does not require the State to adduce evidence of any specific fault on the part of a parent, evidence to prove the statutory grounds for termination under the other sections of § 43-292 will be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of Aaron D., supra*. Thus, it is in the context of analyzing the best interests of the juvenile that courts must respect a parent's commanding interest in the accuracy and justice of the decision to terminate parental rights. *Id*.

In his brief on appeal, Chad argues that the State did not present sufficient evidence at the hearing to demonstrate that termination of his parental rights was in Elaina's best interests. He asserts that the evidence presented showed that he had made some progress toward reunification and that he had a strong desire to achieve such reunification. To the contrary, the State asserts that the evidence clearly and convincingly demonstrated that termination of Chad's parental rights was in Elaina's best interests. The State explained:

> [Chad]'s actions and attitude throughout the course of the case demonstrate his unfitness to parent. He made minimal, if any, effort to rehabilitate. While one might suggest that he resisted services because of his strongly held belief that Elaina had been erroneously adjudicated to be under the Court's jurisdiction, the evidence also shows that [Chad] put those beliefs over the needs of Elaina. He was given a clear plan of the things he needed to accomplish to work toward reunification. He did not successfully complete any of those requirements in any kind of meaningful way. [Chad]'s refusal to recognize the level of care required for Elaina's well-being and the seriousness of her behavior stalled efforts at reunification.
>
> In almost nineteen months, [Chad] failed to complete goals that would even put him on the path toward having contact with Elaina, let alone reunification.

Brief for appellee at 14. Upon our de novo review of the record, we agree with the State that there was clear and convincing evidence to demonstrate that termination of Chad's parental rights was in Elaina's best interests.

The evidence presented at the termination hearing revealed that during the first 18 months this case was pending before the county court, Chad made no progress toward achieving reunification with Elaina. In fact, the evidence revealed that Chad made only nominal efforts toward such reunification during those 18 months. Chad did participate in mental health evaluations and substance abuse evaluations. However, he failed to follow through with any of the recommendations from those evaluations. He did not successfully participate in intensive

- 11 -

outpatient treatment. He only attended a few therapy sessions prior to being discharged by his therapist for his poor attitude. He did not complete a domestic violence batterer's intervention program. During his testimony, Chad blamed his inability to successfully complete these programs on the instructors, on his Department case workers, and on miscommunications. However, the State presented evidence which demonstrated that Chad's failure to complete these programs was the result of Chad's aggressive and inappropriate behaviors during the programming and his complete failure to accept any responsibility for Elaina's removal from his home. Chad repeatedly stated to service providers that he did not need to participate in any services because he did nothing wrong and did not need to improve any area of his life.

Partially because of Chad's failure to cooperate with service providers and complete any of the tenets of his court-ordered reunification plan, Chad was not permitted to see Elaina during the county court proceedings. Chad has not visited Elaina since her removal from the family's home in August 2021. As such, by the time of the termination hearing, Chad had not had any contact with Elaina in 19 months. During his testimony, Chad could not articulate any of Elaina's current behavioral problems or any of her needs. Again, he blamed his lack of knowledge on others, rather than accepting any responsibility for his situation.

Throughout the entirety of the proceedings, Chad denied ever sexually assaulting Elaina. However, he admitted to exposing Elaina to age-inappropriate language, photographs, and movies. He also admitted that Elaina had observed him masturbating while watching pornography and had observed he and Amy engaging in sexual acts. Chad did not see a problem with exposing Elaina to such things. However, after Elaina was removed from Chad's and Amy's home, her foster parents and schools reported that she engaged in sexualized behaviors that were not normal for a child her age. Elaina continually and repeatedly disclosed that she was sexually and physically abused by Chad and Amy. She expressed an extreme fear of returning to Chad's and Amy's home and acted out negatively after visits between she and Amy were held in the family home. Elaina's current foster parent, Wassom, testified that while Elaina has made some progress while in foster care, she still has a lot of work to do to overcome her behavioral issues. Wassom also testified that Elaina requires constant care and observation so that she does not run away, hurt herself, or engage in inappropriate acts with other children. Elaina engages in therapy at least two times per week.

In his brief on appeal, Chad points to the progress he began to make during and after his incarceration in the early months of 2023. Chad finally admitted that he had a substance abuse problem, after he had been denying such a problem for months, while continuing to test positive for methamphetamine on his drug tests. Chad also admitted that he needed inpatient treatment to overcome his substance abuse problem. He began to seek out such treatment the week prior to the termination hearing. However, such treatment had been available and recommended to him for months by that time. Essentially, Chad's claimed progress is too little and too late. Last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Even if Chad were to successfully complete inpatient substance abuse treatment in a reasonable amount of time, he still would need to address the other issues that resulted in Elaina's removal, including, Elaina's allegations of physical and sexual abuse; allegations of domestic violence between he and Amy; and his failure to maintain a safe and appropriate environment for Elaina within the family

home. Chad has been provided ample opportunity to address all of these concerns and has willfully chosen to be noncompliant and noncooperative.

The evidence presented at the termination hearing revealed that Elaina desperately needs stability, permanency, and a caregiver who can meet her special needs. Chad has demonstrated his inability and his unwillingness to provide these things to Elaina. Elaina should not be made to await Chad's uncertain parental maturity. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). Elaina also should not be made to return to an environment she believes to be unsafe, especially when Chad has failed to do anything to convince Elaina, the county court, the Department, or his service providers, that he is capable of making significant changes to his life for the benefit of Elaina. Termination of Chad's parental rights is in Elaina's best interests.

## CONCLUSION

For the reasons stated above, we affirm the order of the county court terminating Chad's parental rights to Elaina.

AFFIRMED.